IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO – EASTERN DIVISION

2006 NOV 14 P 2: 28

UNITED STATES OF AMERICA
ex rel. LAURA RUPERT AND
ROBYN HERZOG,

CIVIL ACTION NO. C2 06 961

Plaintiffs and Relators,

JUDGE ___ JUDGE WATSON

v.

MAGISTRATE JUDGE MAGISTRATE JUDGE KEMP

CARESOURCE MANAGEMENT
GROUP, CO., CARESOURCE, and
CARESOURCE USA HOLDING CO.,

**FILED UNDER SEAL**
pursuant to 31 U.S.C. § 3730
and Local Rule 3.2

Defendants.

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

### I.  INTRODUCTION

1.  Qui Tam Relators Laura Rupert and Robin Herzog bring this action on their own behalf and on behalf of the United States of America to recover damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*. against defendants Dayton Health Plan, Inc. d/b/a CareSource, CareSource Management Group Co., and CareSource USA Holding Co.

2.  Relators' allegations relate to the execution of contracts, called Provider Agreements, by which CareSource promised it would provide managed healthcare services to Ohio Medicaid beneficiaries.  The contracts require that CareSource provide Screening, Baseline Assessment, and Case Management services to Children with Special Health Care Needs ("CSHCN").  CareSource failed to conduct the required assessments of large numbers of special-needs children, while falsely representing that the Baseline Assessments were performed and that the special-needs children were

receiving Case Management services which defendants were required to provide them and for which they was being paid by the United States and the State of Ohio.

## II. JURISDICTION AND VENUE

3. This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

4. Subject-matter jurisdiction is conferred by 31 U.S.C. § 3732 (a) and 28 U.S.C. § 1331.

5. Venue lies under 28 U.S.C. 1391 (b), © and 31 U.S.C. 3732 (a) because defendants transact business within this district and the facts forming the basis of this Complaint occurred within this district. Intradistrict venue is appropriate because defendants maintain an office in Columbus and provide managed-care services to Medicaid beneficiaries in Franklin County.

6. The facts and circumstances of Defendants' violations of the False Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, or in the news media.

7. Relators are the original source of the information upon which this Complaint is based, as that phrase is used in the False Claims Act, and they provided disclosure of the allegations of this Complaint to the United States prior to filing.

## III. PARTIES

8. The real party in interest to the claims set forth herein is the United States of America.

9. Relator Laura Rupert is a resident of Ohio and a citizen of the United

-2-

States. Ms. Rupert was employed by CareSource Management Group as a Telephonic Case Management Queue Nurse from March 1, 2004 until July 15, 2005. Her job was to conduct Baseline Assessments of CSHCN as required by CareSource's Provider Agreements.

10. Relator Robin Herzog is a resident of Ohio and a citizen of the United States. Ms. Herzog was employed by Management Group as a Telephonic Case Management Queue Nurse from March 8, 2004 until July 15, 2005. Her job was to conduct Baseline Assessments of CSHCN as required by CareSource's Provider Agreements.

11. Defendant CareSource is a privately-held not-for-profit Ohio corporation with an office at 395 East Broad Street in Columbus and headquarters in Dayton, Ohio. The corporation's name was Dayton Area Health Plan until a name change on July 25, 2005. Dayton Area Health Plan was incorporated in June 1985.

12. CareSource is a Medicaid Managed Care Plan (MCP) contractor. On information and belief, it is by far the largest Medicaid HMO in Ohio with about 450,000 lives under management (out of total Ohio MCP enrollment exceeding 614,000), and as of 2004 was the sixth-largest Medicaid managed-care plan in the nation. As approximately 70% of Ohio Medicaid beneficiaries are children, Relators allege on information and belief that CareSource is under contract to provide managed-care services to approximately 310,000 children.

13. CareSource provides services in 15 of 17 Ohio counties with managed care for Medicaid beneficiaries. These counties are Butler, Clark, Clermont,

-3-

Cuyahoga, Franklin, Green, Hamilton, Lorain, Mahoning, Montgomery, Pickaway, Stark, Summit, Trumbull and Warren.

14.    CareSource USA Holding Co. ("Holding Co.") is a privately-held for-profit Ohio corporation incorporated on April 15, 1999 and f/k/a Dayton Area Health Plan Holding Corp.  Holding Co. is believed to be the sole shareholder of CareSource. CareSource Holding sets policy for CareSource.

15.    CareSource Management Group, Inc. ("Management Group") is a privately-held for-profit Ohio corporation also incorporated on April 15, 1999 and f/k/a Dayton Area Health Plan Management Co.

16.    Holding Co., Management Group, and CareSource are corporate *alter egos*.

17.    On information and belief, Management Group provides administrative services for CareSource's Medicaid clients under a subcontract with CareSource. Management Group also operates Community Choice in Michigan and CareSource Indiana.

**IV.    FACTS**

**A.    Background**

18.    The Ohio Department of Jobs and Family Services ("ODJFS") is the Ohio agency designated  by Ohio Rev. Code Ann. § 5111.02 to administer the state Medicaid program.

19.    The Balanced Budget Act of 1997 ("BBA") requires that states identify and provide managed care services for Medicaid-enrolled children who qualify as Children

-4-

with Special Health Care Needs ("CSHCN").

    20.    On July 1, 2001, Ohio received approval from the U.S. Department of Health & Human Services, Centers for Medicare and Medicaid Services (CMS), to operate a managed care program (MCP) pursuant to Section 1915 of the Social Security Act, 42 U.S.C. § 1396n.

    21.    The § 1915(b) Waiver permitted ODJFS to mandate managed-care en-rollment of all Ohio Medicaid beneficiaries.

    22.    The Waiver requires that Ohio meet the terms of the BBA regarding CSHCN, including the requirements that providers provide Baseline Assessment and Case Management services to all children preliminarily screened as CSHCN.

    23.    Each State Fiscal Year (SFY) since the Waiver was granted, ODJFS has entered into Provider Agreements (PAs) with CareSource. Ohio's State Fiscal Years begin on July 1 and run through June 30, with SFY 2002 having begun on July 1, 2001.

    24.    The PAs between ODJFS and CareSource require CareSource to screen Medicaid enrollees in order to identify potential CSHCN; to conduct detailed Baseline Assessments of those screened positive; and to provide Case Management services to beneficiaries assessed as CSHCN.

    25.    The Provider Agreements define CSHCN as children between the ages of six months and 21 years who have asthma, HIV/AIDS, or a chronic physical, emotional or mental condition that requires treatment or counseling; and pregnant beneficiaries younger than 17.

    26.    CareSource has entered into Provider Agreements with ODJFS annually

since SFY 2002. CareSource sub-contracts its obligations in relation to screening, assessment, and case management services to Management Group.

27. CareSource is paid by the state on a capitation basis, receiving compensation based on a fixed rate per enrolled patient. CareSource therefore realizes lower profits when utilization is higher.

28. The PAs require CareSource regularly to provide ODJFS with data regarding CareSource's performance of its Screening, Baseline Assessment, and Case Management obligations.

29. These data are used by Ohio to evaluate whether the plan meets, exceeds, or falls short of certain performance standards. These measures govern whether the company is entitled to retain a one-percent reserve fund, must forfeit the reserve fund, or is eligible to receive a bonus.

30. In order to track CSHCN activity by its managed-care providers, ODJFS maintains a data-processing system, the Screening, Assessment and Case Management System ("SACMS").

31. CareSource inputs data to SACMS to report its Screening, Baseline Assessment and Case Management data to ODJFS.

32. The state of Ohio and the United States rely upon the accuracy of Care-Source's SACMS data to track its performance under the PAs.

33. To measure CareSource's compliance with contract requirements, monitor present performance and predict future needs, ODJFS utilizes the Performance Evaluation and Incentive System ("PEIS") to track the number of CSHCN for whom

-6-

Baseline Assessments were performed and Case Management services provided.

### B.   Performance Standards

34.    In each PA, CareSource agreed to specific performance standards with respect to CSHCN Screening, Baseline Assessment and Case Management.  The standards include: (1) A minimum adjusted Screening rate of 60% of newly-enrolled children; (2) a Baseline Assessment rate of 85% of newly-enrolled children who were Screened as potential CSHCN; (3) placement into Case Management of at least 5% of newly-enrolled children; (4) placement into Case Management of at least 5% of all enrolled children; and (5) placement into Case Management of at least 80% of children assessed as CSHCN.

35.    When it promised to follow the requirements of the PAs, CareSource promised to submit to ODJFS accurate monthly screening, assessment, and case management files.  However, the PAs included a vehicle by which CareSource could exempt itself from this requirement by meeting specified Baseline Assessment and Case Management targets.   Specifically, if CareSource reported to Ohio either (a) that 5% of all enrolled children were receiving Case Management services or (b) that 60% were Screened and 85% of positively-screened children received Baseline Assessments, then it was relieved of the obligation to submit case files.

36.    When an MCP is not required to submit its screening and assessment files to ODJFS, its performance is evaluated on the basis of the data the MCP uploads to SACMS.

### C.   Baseline Assessments and Case Management Were Falsely

-7-

**Reported**

37.    Ohio Medicaid enrollees are identified as potential CSHCN in two principal ways.  First, state or county intake personnel may identify potential CSHCN in the course of gathering information to determine Medicaid eligibility.  Second, once eligible beneficiaries are assigned to CareSource, initial intake (screening) personnel at Management Group may identify a potential special-needs child.  In either case, after identification, it was Relators' job to conduct lengthy and detailed assessment interviews to determine whether or not there was, in fact, entitlement to Case Management services.

38.    Baseline Assessments are extensive and lengthy interviews.  Baseline Assessment questionnaires, the questions on which are mandated and approved by ODJFS, consist of five single-spaced pages intended to collect comprehensive and detailed information about the CSHCN whose needs are being assessed.  A properly-conducted Baseline Assessment takes between 30 and 60 minutes to perform.

39.    Shortly after starting work for Management Group, Relators discovered that it was falsely reporting to ODJFS that it had performed CSHCN Baseline Assessments of new and existing Medicaid enrollees.  This false reporting took the form of SACMS computer-system entries that CSHCN Baseline Assessments were completed when they were not.

40.    Management Group required Ms. Rupert and Ms. Herzog and the other Queue Nurses, including at least Terri Emrick, Crystal Scroggins, Jane Selm, and Charlotte Dicks, to mark as "Assessed" newly-screened enrollees whose Baseline

-8-

Assessments were not performed, and then to generate corresponding false records in SACMS.

41.     Management Group supervisors, including Marcia DeBard, Nancy Murphy, and Dee Caldwell, devised "work flows," which were documents directing the flow of screening and assessments. These workflow documents directed the Queue Nurses to mark as "Assessed" each enrollee who had been positively screened but not yet assessed.

42.     If later attempts to contact the enrollee were unsuccessful, the enrollee's information was left in the Missed Queue Call Bucket. Although the Missed Queue Call Bucket was periodically and systematically purged, the false record of Baseline Assessment remained in SACMS.

43.     Defendants also directed the Queue Nurses to mark beneficiaries as "Assessed" based on beneficiaries' answers to questions on initial enrollment postcards which new enrollees mailed in. These cards, which were rewarded with McDonald's gift certificates, were in no way intended to be or approved as substitutes for proper Screening and Baseline Assessment.

44.     Queue Nurses also were provided sheafs of documents, called "White Sheets," each of which contained Screening information regarding an enrollee who the Screener had identified as a CSHCN. The Queue Nurses were required to create computer entries falsely reflecting completion of a Baseline Assessment for each "White Sheet" enrollee.

45.     Periodically, and most often at the end of the month, the Queue Nurses

-9-

were given lists of Member Numbers and ordered to mark those numbers as Assessed. Each such entry was a false record.

46.     Management Group supervisors and managers, to include at least Marcia DeBard and Nancy Murphy, participated in creating false Baseline Assessment records when they knew the Assessments had not been performed.  While DeBard and Murphy were qualified to make Assessments, Relators are aware that DeBard and Murphy claimed to complete many more Baseline Assessments than was possible and believe they did few, if any, actual Assessments.

47.     Shortly after Relators began working as Queue Nurses, Marcia DeBard said to them, "Thank God I don't have to mark these [in SACMS, as being Assessed] anymore."  Relators understood DeBard to mean that, before the Relators became employed at Management Group, she had been falsely marking new enrollees as Assessed when they were not.

48.     Relators estimate that Baseline Assessments were properly completed for approximately 10% of children whose screening identified them as CSHCN.

49.     The "Missed Queue Call Bucket" was from time to time purged of Screened enrollees who had not yet been Assessed, but who were the subject of false Assessment indications in SACMS.

50.     Management Group accomplished this purge by requiring the Queue Nurses to compare a list of enrollees who had accessed health care services against the Call Bucket.  Enrollees who had not accessed health care services for several months were taken out of the Call Bucket and an entry was placed in SACMS that the

-10-

enrollee "Refused Case Management Services."

51.     The enrollees did not refuse Case Management Services.  In fact, CareSource never notified them that they were entitled to receive the Baseline Assessment and Case Management services which CareSource promised to provide.

52.     By manipulating the SACMS data, first to show falsely that Baseline Assessments were properly completed and then to show falsely that Case Management services had been offered but refused, CareSource created the false appearance that it was providing both Assessment and Case Management services to far more CSHCN than were actually receiving such services.

53.     By so doing, CareSource concealed from ODJFS the fact that it was not performing required Baseline Assessments and providing required Case Management services.

54.     By manipulating the Baseline Assessment process, CareSource pre-vented eligible CSHCN from obtaining Case Management services.

55.     The purpose of Case Management is to ensure that the special health needs of CSHCN are noted and attended to, and that the children and their families receive education and treatment for those special needs.  This includes such things as proper prenatal care for young pregnant women and counseling for children with emotional problems.

56.     By creating false records showing that special-needs children were receiving Case Management services (or refused to accept them), defendants failed to honor fundamental requirements of their Provider Agreements.

-11-

57.    The State of Ohio and the United States paid Medicaid funds to defend-
ants for Case Management services which they failed to provide.

58.    The false SACMS data generated by Management Group were intended
to lead ODJFS to believe that Baseline Assessments were conducted and CSHCN
were being routed into, and were receiving (or refusing) Case Management services.

59.    Defendants' false reporting of the improperly conducted or non-existent
assessments were ongoing when Relators Rupert and Herzog terminated their employ-
ment with Defendant Management Group on July 15, 2005.  Relators allege on informa-
tion and belief that such practices continue.

60.    Defendants' falsification of CSHCN Assessment and Case Management
data harmed the United States by causing the United States to pay for services which
the Defendants failed to provide or provided inadequately.  In addition, to the extent
that enrollees were falsely shown to have received Baseline Assessments, they were
denied Case Management and managed-care services to which they were entitled, and
the program did not receive that for which it paid.

61.    Defendants' falsification of data caused the state of Ohio routinely to
receive and rely upon bogus data which defendants used to create a false appearance
of compliance with CMS requirements for Ohio's 1915(b) waiver.

**D.    Unqualified Personnel Were Required to Conduct Assessments**

62.    The Provider Agreements require Baseline Assessments to be performed
by appropriate health care professionals, to include a physician, physician assistant,
registered nurse, licensed practical nurse, licensed social worker, or graduate of a two-

-12-

or four-year health program. If the Baseline Assessment is conducted by a medical professional who is not a physician or registered nurse, then a physician or registered nurse must oversee the assessment.

63. Defendants required unlicensed Screeners to conduct Baseline Assessments in violation of the Provider Agreements.

64. Manager Dee Caldwell supervised the Queue Nurses in their performance of Baseline Assessments. However, she was not a registered nurse, and thus was not qualified to supervise the LPN Queue Nurses.

65. Carol Smith, who was Relators' supervisor form October 2004 to January 2005, previously worked for the Medicare Waiver Program and was familiar with its requirements. Ms. Smith repeatedly told Relators that she had reported to Marcia DeBard that permitting unlicensed workers to conduct Baseline Assessments was contrary to the Provider Agreements and illegal.

66. Ms. Smith told Relators that it was illegal for CareSource to require them to use White Sheets and enrollment postcards to create SACMS records indicating that Baseline Assessments were performed.

67. Management Group fired Ms. Smith on grounds which Relators believe to have been a pretense.

**E.    Required Case Management Services Were Not Provided**

68. On many occasions when Baseline Assessments were properly conducted, defendants directed the LPN Queue Nurses, including Relators, to create computer records which assigned themselves as Case Managers and to attempt to

-13-

undertake Case Management procedures, though the Provider Agreements dictated that case-management services were to be initiated and conducted by a physician or registered nurse.

69.    When Relators and other Queue Nurses assigned themselves as Case Managers, they did not actually provide Case Management services, because they were not trained as Case Managers and did not have available to them the resources necessary to provide Case Management services.  Their designation as Case Manager was a sham intended to create the false appearance that  CSHCN were receiving the Case Management services for which CareSource was paid Medicaid funds belonging to the United States and the State of Ohio.

70.    Defendants also directed the Queue Nurses to persuade qualified adults to "refuse" case management services because there were not sufficient nurses to meet the needs of all those who were qualified to receive the services.

**D.    Required Fraud Detection Processes Were Not Implemented**

71.    The Provider Agreements require CareSource to comply with all applicable federal and state statutes, regulations, the Ohio Administrative Code and other requirements.

72.    One such requirement is that CareSource develop and implement a program to detect fraud and abuse, which system is also capable of identifying and remedying fraudulent claims, submissions, and billing activity.

73.    Rather than developing an anti-fraud program, Defendants encouraged and assisted in the various practices described herein, including reporting and

-14-

submitting false data to the ODJFS.

### E. Reporting Inaccurate CSHCN Data to ODJFS

74. Defendants' purposes in manipulating the SACMS data included causing ODJFS to utilize bogus data to determine whether defendants satisfied or exceeded minimum performance goals and should be penalized or rewarded for their performance.

75. In the spring of 2004, Relators were advised of an e-mail written by Nancy Murphy, Director of Care Management for Management Group. Ms. Murphy reported that SACMS data showed the Queue Nurse Baseline Assessment completion statistics at 64% of Screened subjects. This was substantially lower than the minimum required under the PAs.

76. Shortly thereafter, Relators received an e-mail from Marcia DeBard which stated that the "preliminary average assessment numbers" were 97.5% and the "earlier numbers" were incorrect. Relators know that they did not perform sufficient Baseline Assessments to justify the increased percentage, and on that basis allege that Management Group personnel manipulated SACMS data to reflect the higher numbers.

77. Ms. DeBard told Relators that she had altered reports, including a report purporting to document CSHCN with asthma, in order to falsely increase the number of Baseline Assessments reported by Defendants. She also said that the purpose of the false reports was to ensure that defendants satisfied the quota and bonus provisions of the PAs.

78. By manipulating Baseline Assessment and Case Management data,

defendants were able to mislead ODJFS into relieving defendants of the obligation to submit member files. Thus, it was essentially impossible for ODJFS to detect defendants' data falsification.

F.     **False Certifications of the Accuracy of Data Submitted to ODJFS**

79.     42 CFR §§ 438.604, 606(a) requires that defendants' payment claims certify the accuracy of data they submit to ODJFS. The certification must be made by the CEO, CFO, or a delegated official who reports directly to the CEO. The certification attests to the accuracy, completeness, and truthfulness of the data and the documents specified by the state, and the certification is to be filed concurrently with the data. 42 CR 438.606. This certification is also required by the Provider Agreement.

80.     Defendants provided data to ODJFS, and with each submission, they were required to certify that the data was accurate, complete, and truthful.

81.     Those certifications were false and material.

82.     Defendants' false certifications were intended to mislead ODJFS and the United States into believing that defendants met the CSHCN program requirements related to their Medicaid enrollees.

G.     **Defendants Failed to Provide Adequate Case Management Services**

83.     Under the PAs, defendants promised to provide or arrange Case Management services for each special-needs child, including development and retention of a Treatment Care Plan; identification of a Primary Care Physician; identification of a Case Manager; and coordination of services and providers. Coordination of services must, where appropriate, include the involvement of health

-16-

and/or social service agencies.  Care plans must identify clear, objective measures regarding quality of care and health outcomes.

84.    Case Management plans must be monitored and updated regularly.

85.    These requirements were not met with respect to the CSHCN who did not receive Case Management due to falsified Baseline Assessment data.

86.    These requirements also were not met with respect to many CSHCN who were ostensibly provided Case Management services, because defendants did not adequately staff their Case Management operation.  Relators observed that Case Management personnel routinely did not have time to provide required services to CSHCN, and that CSHCN Treatment Care Plans were rarely or never monitored and updated.

## H.    Defendants Obtained or Retained Medicaid Funds to Which They Were Not Entitled.

87.    Defendants manipulated and submitted false screening, assessment, and case management data to ODJFS to make it appear that Defendants had reached goals which they had not achieved.  Defendants' submission of false data and false certifications enabled them to avoid monetary sanctions and to receive performance bonuses and/or financial incentives to which they were not entitled.

88.    David Snow of Management Group's Compliance Department told Relators that Management Group risked losing $6.3 million for each six-month reporting period in SFY 2004 that they did not meet applicable minimum performance measures.

-17-

89.     Defendants' false data submissions and certifications permitted them to maintain their status as an MCP in good standing with ODJFS.

90.     Had the data been accurately reported, ODJFS could have determined that defendants were not meeting the minimum requirements and thus were subject to the penalties and sanctions set forth in the Provider Agreements. Repeated or ongoing noncompliance could lead to termination or nonrenewal.

## I.     Defendants Failed to Initiate Corrective Action For Known Program Violations.

91.     Pursuant to Ohio Administrative Code (OAC) Rule 5101:3-26-10(F), whether or not ODJFS imposes a sanction, MCPs are required to initiate corrective action for any MCP program violations or deficiencies as soon as they are identified by the MCP or by ODJFS.

92.     Defendants CareSource and Management Group, through their officers, supervisors, and managers, including without limitation Dee Caldwell, Marcia DeBard, and Pamela Morris, knew that the screening, assessment, and case management services were not provided as required by the PAs and CSHCN program and that defendants were reporting false screening, assessment, and case management data to ODJFS.

93.     Rather than initiate corrective action, defendants continued to direct their employees to continue the CSHCN program violations as described above. This failure to take corrective action constituted on-going instances of violations of the False Claims Act.

-18-

94.     Defendants' actions were material.  Had they advised ODJFS or the United States that they were falsifying CSHCN Baseline Assessment and Case Management data, they would not have been paid for those services, and those omissions and false certifications proximately caused the damages described herein.

## Count I
## Violation of False Claims Act – 31 U.S.C. Section 3729(a)(1)–(2), (7)

95.     Relators re-allege ¶¶ 1-94 as if fully set forth herein.

96.     Defendants' failure to perform required CSHCN Baseline Assessments and provide Case Management services, together with their submission of false CSHCN data to ODJFS violated Defendants' contracts with ODJFS and/or each other and covered up a substantial failure of service to Ohio special-needs children, their families, and the Medicaid program.

97.     Each time CareSource caused a Queue Nurse or other employee to create a false record of a Baseline Assessment, a false designation of Case Manager, a false record of Case Management Services Refused, or any other false computer record, CareSource created a false document or record which it intended to and did use to get a false claim paid, thereby violating the False Claims Act, 31 U.S.C. § 3729(a)(2).

98.     Each time CareSource submitted a false certification that data it supplied to the State of Ohio was accurate, it created a false document or record which it intended to  use to get a false claim paid, thereby violating the False Claims Act, 31 U.S.C. § 3729(a)(2).

99.     Claims for payment and claims regarding bonus, incentive, and retention

payments associated with Defendants' activities under their Provider Agreements during the period in which false CSHCN Baseline Assessment or Case Management data were submitted were false claims in violation of 31 U.S.C. § 3729(a)(1).

100. Submission of false documents, records, certifications, or claims to ODJFS as Ohio Medicaid administrator constitutes submission of false documents, records, certifications, or claims to the United States by operation of 31 U.S.C. § 3729(c).

101. When defendants submitted false documents to ODJFS in order to avoid the obligation to repay retention amounts, it used false documents to avoid an obligation to repay money in violation of 31 U.S.C. § 3729(a)(7).

All of defendants' conduct described in this Complaint was knowing, as that term is used in the False Claims Act.

WHEREFORE, Relators request the following relief:

A. Judgment against defendants for three times the amount of damages the United States has sustained because of their actions, plus a civil penalty of $11,000 for each violation of the False Claims Act.

B. 25% of the proceeds of this action if the United States elects to intervene, and 30% if it does not.

C. Their attorneys' fees, costs, and expenses.

D. Such other relief as the Court deems just and appropriate.

Respectfully submitted,

Frederick M. Morgan, Jr. (0027687)
Trial Attorney
VOLKEMA THOMAS, LPA
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202
Tel. (513) 651-4400
Fax (513) 651-4405
e-mail: rmorgan@vt-law.com


OF COUNSEL:

Daniel R. Volkema (0012250)
Monique A. Hall (0075506)
VOLKEMA THOMAS, LPA
140 East Town Street, Suite 1100
Columbus, Ohio 43215
Tele: (614) 221-4400
Fax: (614) 221-6010
Email: dvolkema@vt-law.com
       mhall@vt-law.com

and

Brian P. Kenney
Eric L. Young
Pamela C. Brecht
KENNEY LENNON & EGAN
3031C Walton Road, Suite 202
Plymouth Meeting, PA 19462
Tel. (610) 940-9099
Fax (610) 940-0284
e-mail: bkenney@kle-law.com